PAUL B. SNYDER
United States Bankruptcy Judge
1717 Pacific Ave, Suite 2209
Tacoma, WA 98402

✓ FILED
\_\_\_\_ LODGED
\_\_\_\_ RECEIVED

**January 23, 2008**

MARK L. HATCHER
CLERK U.S. BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA
_____DEPUTY

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| In re: | Case No. 07-42537 |
| ALLEN SCOTT WEAR and DEBRA LYNN WEAR, | **MEMORANDUM DECISION** |
| Debtors. | **NOT FOR PUBLICATION** |

THIS MATTER came before the Court on January 8, 2008, on the Objection by Toyota Motor Credit Corporation to Confirmation of Plan. Allen Scott Wear and Debra Lynn Wear (Debtors) filed a response to the objection, to which Toyota Motor Credit Corporation (Toyota) filed a reply. At the conclusion of the hearing, the Court took the matter under advisement. This Memorandum Decision shall constitute findings of fact and conclusions of law as required by Fed. R. Bankr. P. 7052. This is a core proceeding under 28 U.S.C. § 157(b)(2). The Court has the jurisdiction to enter a final order under 28 U.S.C. § 1334, 28 U.S.C. § 157, and 28 U.S.C. § 151. Based on the evidence and arguments presented, the Court's findings of fact and conclusions of law are as follows:

MEMORANDUM DECISION - 1

**I**

**FINDINGS OF FACT**

The facts are not in dispute. On March 25, 2007, the Debtors agreed to purchase a 2007 Toyota Camry LE pursuant to the terms of a written retail installment contract. The aggregate value of the installment contract was $41,548.08, which included negative equity on a trade-in vehicle in the amount of $8,700. On that same day, the Debtors agreed to purchase a 2007 Toyota Camry SD pursuant to the terms of a written retail installment contract. The aggregate value of the installment contract was $41,363.28, which included negative equity on a trade-in vehicle in the amount of $7,100. Toyota is the assignee under both retail installment contracts of the seller's interest and holds a perfected security interest in both vehicles (Vehicles).

The Debtors filed for relief under Title 11, Chapter 13 on August 9, 2007, less than 910 days after entering into the installment contracts. On August 20, 2007, the Debtors filed their balance of bankruptcy schedules and their Chapter 13 Plan (Plan). In their Plan, the Debtors propose two equal periodic payments of $425.00 at 8% interest to Toyota for the two Vehicles. The Debtors value each Vehicle at $20,000. The contract for the Toyota Camry LE requires monthly payments of $486.77, and the contract for the Toyota Camry SD requires monthly payments of $484.61. Toyota filed a secured proof of claim in the amount of $30,140.35 for the Toyota Camry LE and a secured proof of claim in the amount of $30,002.08 for the Toyota Camry SD.

On September 13, 2007, Toyota filed an objection to confirmation of the Debtors' Plan. The objection indicates that the Debtors were in default under the installment contracts for having failed to make monthly payments due after August 9, 2007. The objection sets

MEMORANDUM DECISION - 2

forth the payoff balance for the Toyota Camry LE as $30,335.61, with a replacement value of $18,566.88. The payoff balance for the Toyota Camry SD is listed as $30,196.45, with a replacement value of $18,566.88. In its objection, Toyota argued that because the aggregate value of each contract exceeded $40,000, the transactions are not "consumer good transactions," so that the inclusion of negative equity on the trade-in vehicles did not "transform" Toyota's purchase money security interests in the Vehicles into non-purchase money security interests. Consequently, the debts are not subject to being "crammed down." Toyota also objected to the interest rate of 8%.

In their response, the Debtors argued that the Plan properly treats the debts pursuant to the cram down provisions of 11 U.S.C. § 506(a)[1] and § 1325(a). The Debtors reasoned that because the financing of both Vehicles included negative equity on trade-in vehicles, Toyota is not a purchase money creditor.

**II**

**CONCLUSIONS OF LAW**

There is no dispute that for purposes of the 11 U.S.C. § 1325(a) "hanging paragraph,"[2] the Debtors purchased the Vehicles for their personal use, and the purchases were made within 910 days of the Debtors' bankruptcy filing. The sole issue then is whether

---

[1] Unless otherwise indicated, all "Code," Chapter and Section references are to the Federal Bankruptcy Code, 11 U.S.C. §§ 101-1532, as amended by BAPCPA, Pub. L. 109-8, 119 Stat. 23, as this case was filed after October 17, 2005, the effective date of most BAPCPA provisions.

[2] The "hanging paragraph" of 11 U.S.C. § 1325(a) provides in pertinent part as follows:
> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor . . . .

MEMORANDUM DECISION - 3

Toyota holds a "purchase money security interest" (PMSI) in each Vehicle, where a portion of each debt also represents financing of negative equity on a trade-in vehicle.

**A. Purchase Money Security Interest**

This Court has reviewed the extensive case law on the issue before it and the sharply divided decisions on whether a PMSI includes negative equity. While the differing cases set forth thoughtful, logical analyses, the Court finds most persuasive the thorough and well-reasoned decision by Judge Dunn in In re Johnson, No. 07-31717-rld13, 2007 WL 4510288 (Bankr. D. Or. Dec. 19, 2007). To the extent the relevant Oregon statutes are consistent with the applicable Washington statutes, the Court adopts Judge Dunn's analysis and conclusions, as set forth below.

The Bankruptcy Code does not define PMSI. Consistent with other courts inside and outside of the Ninth Circuit, this Court looks to state law to determine whether Toyota holds a PMSI in both Vehicles. See, e.g., Johnson, 2007 WL 4510288 at *3. Similar to Oregon law, under Washington State's version of the Uniform Commercial Code (UCC), each of Toyota's security interests is a PMSI "to the extent" that the Vehicles "are purchase-money collateral with respect to that security interest." RCW 62A.9A-103(b)(1). The Vehicles constitute "purchase-money collateral" if they are "goods or software that secures a purchase-money obligation incurred with respect to that collateral." RCW 62A.9A-103(a)(1). Washington law defines a "purchase-money obligation" as "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in, or the use of, the collateral, if the value is in fact so used." RCW 62A.9A-103(a)(2). Thus, Toyota must establish that the debts for the two Vehicles were either all or part of the price of the

MEMORANDUM DECISION - 4

Vehicles, or were incurred for value given to enable the Debtors to acquire the rights to the Vehicles.

### 1. Price of the collateral

Analyzing the first alternative definition of a "purchase-money obligation," this Court finds persuasive Official Comment 3 to § 9-103 of the UCC, which provides as follows:

> [T]he "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.

Official Comment 3 also requires a "close nexus between the acquisition of collateral and the secured obligation." Johnson sets forth a discussion of the different lines of reasoning as to (1) whether negative equity is a component of the "price of the collateral," and (2) whether inclusion of negative equity in a single package financing agreement constitutes a sufficient nexus between the acquisition of the collateral and the secured obligation to transform negative equity into part of the price of the vehicle financed. Johnson, 2007 WL 4510288 at *4-6. This Court adopts Judge Dunn's conclusion that "price of the collateral" does not include negative equity:

> Negative equity is not similar in nature or scope to the other "expenses incurred in connection with acquiring rights in the collateral" contemplated by Official Comment 3. More importantly, I agree with the Lavigne court that the liability for negative equity is not an expense "incurred in connection with acquiring" the Vehicle; it is an antecedent debt.

Johnson, 2007 WL 4510288 at *6.

Supporting this result is Washington's definition of "sale price" contained in Chapter 63.14 Retail Installment Sales of Goods and Services. RCW 63.14.010(12) defines "sale price" as follows:

MEMORANDUM DECISION - 5

> "Sale price" means the price for which the seller would have sold or furnished to the buyer, and the buyer would have bought or obtained from the seller, the goods or services which are the subject matter of a retail installment transaction. The sale price may include any taxes, registration and license fees, any vehicle dealer administrative fee, any vehicle dealer documentary service fee, and charges for transferring vehicle titles, delivery, installation, servicing, repairs, alterations, or improvements.

Similar to Oregon, the Washington definition "does not explicitly include negative equity, as do similar statutes in New York, Georgia, and California." Johnson, 2007 WL 4510288 at *7. Thus, the Court concludes that negative equity does not constitute part of the purchase price of the Vehicles under Washington law.

**2. Value given to enable the debtor to acquire rights in the collateral**

An alternative definition of "purchase-money obligation" is an obligation incurred for "value given to enable the debtor to acquire rights in, or the use of, the collateral, if the value is in fact so used." RCW 62A.9A-103(a)(2). Analysis of this definition overlaps considerably with that of "price of the collateral." "There is greater division among courts on the question of whether 'value given' in the form of financing negative equity creates a close nexus with the acquisition of collateral." Johnson, 2007 WL 4510288 at *8.

Once again, this Court agrees with the conclusion reached in Johnson. The "financed negative equity is nothing more than a refinance of the pre-existing debt[s] owed on the Trade-In[s]." Johnson, 2007 WL 4510288 at *10. Thus, the financed negative equity does not create the "close nexus" between the "value given" and the Debtors' rights in the Vehicles.

Accordingly, under the installment contracts for both Vehicles, the financed negative equity is not a purchase money obligation.

MEMORANDUM DECISION - 6

**B. Dual Status Rule**

The instant case presents a more straightforward analysis of this issue since at oral argument the Debtors agreed that the aggregate value of the installment contract for each Vehicle exceeds $40,000, and under Washington's adoption of the UCC, these transactions are "nonconsumer-goods transactions." See RCW 62A.9A-102(25)(B), (26). Under RCW 62A.9A-103(f), "[i]n a transaction other than a consumer-goods transaction, a purchase-money security interest does not lose its status as such, even if: (1) The purchase-money collateral also secures an obligation that is not a purchase-money obligation." Official Comment 3 to § 9-103 of the UCC provides a helpful explanation and illustration of this statutory provision:

> 7. **Provisions Applicable Only to Non-Consumer-Goods Transactions.**
>
> a. **"Dual-Status" Rule.** For transactions other than consumer-goods transactions, <u>this Article approves what some cases have called the "dual-status" rule, under which a security interest may be a purchase-money security interest to some extent and a non-purchase-money security interest to some extent</u>. (Concerning consumer-goods transactions, see subsection (h) and Comment 8.) Some courts have found this rule to be explicit or implicit in the words "to the extent," found in former Section 9-107 and continued in subsections (b)(1) and (b)(2). The rule is made explicit in subsection (e). For non-consumer-goods transactions, this Article rejects the "transformation" rule adopted by some cases, under which any cross-collateralization, refinancing, or the like destroys the purchase-money status entirely.
>
> Consider, for example, what happens when a $10,000 loan secured by a purchase-money security interest is refinanced by the original lender, and, as part of the transaction, the debtor borrows an additional $2,000 secured by the collateral. Subsection (f) resolves any doubt that the security interest remains a purchase-money security interest. Under subsection (b), however, it enjoys purchase-money status only to the extent of $10,000.

(emphasis added).

In this case, the uncontested facts establish that the installment contract for the Toyota Camry LE included negative equity in the amount of $8,700. Under the dual status

MEMORANDUM DECISION - 7

rule, then, Toyota has a PMSI in all but $8,700 of the amount financed for the Toyota Camry LE.  The uncontested facts also establish that the installment contract for the Toyota Camry SD included negative equity in the amount of $7,100.  Under the dual status rule, Toyota also has a PMSI in all but $7,100 of the amount financed for the Toyota Camry SD.  Thus, for both Vehicles, 11 U.S.C. § 506 does not apply to those portions of the installment contracts that qualify as purchase money security interests.  Toyota's objection to confirmation is sustained in part.

DATED: January 23, 2008

_____
Paul B. Snyder
U.S. Bankruptcy Judge

MEMORANDUM DECISION - 8